1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7   T-MOBILE USA, INC., et al.,

8                                    Plaintiffs,

9          v.                                              CASE NO. C07-1644RAJ

10  THE CITY OF ANACORTES,                                 ORDER

11                                   Defendant.

12
13

## I.  INTRODUCTION

14        This matter comes before the court on cross-motions for summary judgment (Dkt.

15  ## 12, 27).  The court has considered the parties' briefing and supporting evidence, and

16  has heard from the parties at oral argument.  The parties agreed at oral argument that no

17  material facts are in dispute to prevent the court from ruling on their respective summary

18  judgment motions.  For the reasons stated below, the court GRANTS Plaintiffs' motion

19  and DENIES Defendant's motion.

20        ## II.  BACKGROUND

21        Plaintiffs T-Mobile USA, Inc., and T-Mobile West Corporation (referred to

22  collectively as "T-Mobile") provide digital wireless voice, messaging and data services.

23  T-Mobile's service operates through its cellular radio telephone network, which is

24  comprised of thousands of cell antenna sites, switching facilities, and other network

25  elements.  The federal government assigns each wireless carrier a limited amount of

26  frequency, which is divided into a certain number of radio frequency ("RF") channels,

27  and the RF channels are assigned to the cell sites to enable wireless communication.  The

28  limited number of RF channels must be reused at different cell sites, creating potential

ORDER - 1

1  interference between sites.  To minimize such interference, all sites transmit at very low

2  power, resulting in limited coverage from each site.  The location of antenna sites is

3  determined by terrain, structure blockage, call volume, and antenna height.

4          T-Mobile sought to expand its coverage in the City of Anacortes ("the City"), on

5  the northern portion of Fidalgo Island in Puget Sound, in September 2006.  T-Mobile

6  applied for a permit to construct an additional wireless telecommunications facility

7  ("WCF") at a particular site.  The permit application analyzed eighteen site alternatives

8  and proposed the construction of a 116-foot monopole with three antennas at the top.

9  The facility would also include a new equipment building to house associated radio

10  cabinets.  T-Mobile proposed building the facility on property owned by the United

11  Methodist Church, located in a residential neighborhood.

12          The Anacortes Municipal Code ("AMC") regulates the permitting approval

13  process and creates three paths to permit approval.  The first path is for "permitted uses,"

14  which includes wireless facilities that are to be located on public property.  No review or

15  approval is required for these uses.  AMC 17.63.050.  The second path is an

16  administrative approval process that applies to a limited number of locations, which do

17  not include any residential zones.  AMC 17.63.060(B).

18          The third and most used path is the "special use permit" ("SUP") path.  *See* AMC

19  17.63.070(A)(1).  SUP applications are subject to layers of review under three chapters of

20  the AMC.  In addition to the process outlined in Chapter 17.63, SUP applications are

21  subject to the City's general zoning regulations in Chapter 17.64 and the procedures and

22  requirements imposed by AMC 17.10.100.  The AMC lists eight factors the City shall

23  consider when deciding whether to grant a SUP application: (1) the height of the

24  proposed tower, (2) the proximity of the tower to residential structures and district

25  boundaries, (3) the nature of uses on adjacent and nearby properties, (4) the surrounding

26  topography, (5) the surrounding tree coverage and foliage, (6) the design of the tower

27  (with emphasis on features that reduce or eliminate visual obtrusiveness), (7) proposed

28

ORDER - 2

1   ingress and egress, and (8) the availability of alternatives not requiring a tower.  AMC

2   17.63.070(B)(2).

3          A SUP applicant proposing to build a cell tower must provide the following

4   information in the permit application:

5       a.   A scaled site plan clearly indicating the location, type and height of the
            proposed tower, on-site land uses and zoning, adjacent land uses and zoning
6            (including when adjacent to other municipalities), comprehensive plan
            classification of the site and all properties within the applicable separation
7            distances set forth in Section 17.63.070(B)(5), adjacent roadways, proposed
            means of access, setbacks from property lines, elevation drawings of the
8            proposed tower and any other structures, topography, parking, and other
            information deemed by the zoning administrator to be necessary to assess
9            compliance with this chapter;

10      b.   Legal description of the parent tract and leased parcel (if applicable);

11      c.   The setback distance between the proposed tower and the nearest
            residential unit, platted residentially zoned properties, and unplatted
12           residentially zoned properties;

13      d.   The separation distance from other towers described in the inventory of
            existing sites submitted pursuant to Section 17.63.040C shall be shown on
14           an updated site plan or map.  The applicant shall also identify the type of
            construction of the existing tower(s) and the owner/operator of the existing
15           tower(s), if known;

16      e.   A landscape plan showing specific landscape materials;

17      f.   Method of fencing, and finished color and, if applicable, the method of
            camouflage and illumination;
18
19      g.   A description of compliance with Sections 17.63.040C, D, E, F, G, J, L,
            and M, 17.63.070(B)(4), (5) and all applicable federal, state or local laws;

20      h.   A notarized statement by the applicant as to whether construction of the
            tower will accommodate collocation of additional antennas for future users;
21
        i.   Identification fo the entities providing the backhaul network for the tower(s)
22           described in the application and other cellular sites owned or operated by
            the applicant in the municipality;
23
24      j.   A description of the suitability of the use of existing towers, other structures
            or alternative technology not requiring the use of towers or structures to
25           provide the services to be provided through the use of the proposed new
            tower.

26   AMC 17.63.070(B)(1).  Chapter 17.63 also specifies that the installation of antennas or

27   towers in violation of the chapter is a criminal misdemeanor.

28

     ORDER - 3

1   The permitting process requires the applicant to appear for a hearing before the

2   Planning Commission, and the commission then makes a recommendation to the City

3   Council.  AMC 17.10.100(E)(5) and (6).  The City Council shall deny an application

4   unless the applicant demonstrates, *inter alia*, that the proposed use "is designed in a

5   manner which is compatible with the character and appearance of the vicinity," "is

6   designed in a manner that is compatible with the physical characteristics of the subject

7   property," "is not in conflict with the health and safety of the community," and "is in

8   compliance with the comprehensive plan."  AMC 17.10.100(B)(2)(a), (c), (e), (h).

9   After a community meeting was held to discuss the application, environmental-

10   impact review was conducted, and multiple hearings were held before the Planning

11   Commission and City Council, the City Council denied T-Mobile's application.  T-

12   Mobile sued the City, claiming that the AMC violates the federal Telecommunications

13   Act of 1996 ("the Act") on its face, and that the City Council's denial also violates the

14   Act as applied.

### III.  DISCUSSION

15   **A.    Legal Standard on Summary Judgment.**

17   Summary judgment is appropriate if "the pleadings, depositions, answers to

18   interrogatories, and admissions on file, together with the affidavits, if any, show that there

19   is no genuine issue as to any material fact and that the moving party is entitled to

20   judgment as a matter of law."  Fed. R. Civ. P. 56(c).

21   **B.    The AMC is preempted by Section 253(a) of the Act.**

22   The purpose of the Act is to "'provide for a pro-competitive, de-regulatory

23   national policy framework designed to accelerate rapidly private sector deployment of

24   advanced technologies and services . . . by opening all telecommunications markets open

25   to competition.'"  *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d

26   1260, 1264 (S.D. Cal. 2002) (quoting *Cellular Tel. Co. v. Oyster Bay*, 166 F.3d 490, 492-

27   93 (2d Cir. 1999).  The Act seeks to prevent state and local governments from prohibiting

28   the ability of any entity to provide telecommunications services: "No State or local statute

ORDER - 4

1    or regulation, or other State or local requirement, may prohibit or have the effect of

2    prohibiting the ability of any entity to provide an interstate or intrastate

3    telecommunications service." 47 U.S.C. § 253(a).  Section 253(a)'s preemptive language

4    is "'virtually absolute' in restricting municipalities to a 'very limited and proscribed role

5    in the regulation of telecommunications.'"  *Sprint Telephony PCS, L.P. v. County of San*

6    *Diego*, 490 F.3d 700, 712 (9th Cir. 2007) (quoting *Qwest Commc'ns Corp. v. City of*

7    *Berkeley*, 433 F.3d 1081, 1256 (N.D. Cal. 2001)).

8        Section 253(a)'s preemption applies not only to general prohibitions on

9    telecommunications services, but courts have also held that a combination of certain

10   conditions imposed by local ordinances amounts to a prohibition for purposes of Section

11   253(a).  The following features of a local ordinance have caused courts to find

12   preemption: (1) an onerous permit application process, (2) a franchise requirement, (3)

13   penalties for failure to comply with ordinance requirements, (4) subjective aesthetic

14   design requirements, and (5) regulations granting unfettered discretion to the zoning

15   authority to deny permits.  *See Sprint*, 490 F.3d at 716; *City of Auburn v. Qwest Corp.*,

16   260 F.3d 1160, 1175-76 (9th Cir. 2001); *Cox*, 204 F. Supp. 2d at 1265-66.

17       In this case, T-Mobile claims that the AMC is preempted because it (1) creates an

18   onerous permit application process, (2) imposes criminal penalties for non-compliance,

19   and (3) reserves unfettered discretion to the City Council to deny permit applications

20   based on subjective and aesthetic factors.  The City tacitly concedes the first two claims[1],

21

22

23   _____

24       [1]Although the City devotes a section of its brief to arguing that the AMC does not impose
burdensome requirements, its arguments boil down to a contention that the AMC's voluminous

25   submission requirements are allowed under Section 332(c)(7).  *See* Deft.'s Opp'n at 13-15.  But
this argument is not actually a dispute as to whether the requirements themselves are burdensome.

26   It is true that some burdensome requirements may be necessary to protect the public safety and
welfare, and thus exempted from preemption under Section 253(b), but that argument is based on

27   an assumption that the requirements are burdensome.  Therefore, the court views the City's

28   argument to be a tacit concession that the requirements are burdensome.

ORDER - 5

1  but focuses on T-Mobile's contention that the AMC grants the City Council unfettered

2  discretion.

3         To support its claim of unfettered discretion, T-Mobile focuses on five sections of

4  the AMC.  Section 17.63.070(B)(2) sets out eight criteria for purposes of evaluating a

5  cell-tower permit application.  These criteria include the proximity of the tower to

6  residential areas, the surrounding topography, and whether the tower has been designed

7  to reduce or eliminate visual obtrusiveness.  *See* AMC 17.63.070(B)(2)(a)-(h).  AMC

8  17.64.010(A) requires that the permit applicant demonstrate and explain "the need for the

9  particular facility in the proposed location," and AMC 17.10.100(B)(1) requires that the

10 applicant show that the use would not be "detrimental to the surrounding neighborhood

11 . . . [and] will not be a liability to the neighboring uses."  The AMC also directs the City

12 Council to deny a permit application unless the applicant demonstrates, *inter alia*, that the

13 design of the proposed use is compatible with the vicinity's character and appearance,

14 and that the use does not hinder neighborhood circulation or discourage development.

15 *See* AMC 17.10.100(B)(2)(a) & (b).  Finally, the AMC authorizes the City Council to

16 "impose conditions upon a particular use if it is deemed necessary for the protection of

17 the surroudning properties and for the general welfare of the public and/or to provide for

18 compliance with conditional use permit criteria."  AMC 17.10.100(B)(3).

19        T-Mobile claims that because the AMC imposes the subjective criteria listed

20 above, it is impossible for T-Mobile or any other applicant to know whether its

21 application will be approved.  According to T-Mobile, this is precisely the type of

22 discretionary permitting process that the Act seeks to prevent.  According to the City, the

23 AMC validly protects legitimate concerns about a cell tower's effect on a community's

24 aesthetic values and development potential as traditional zoning prerogatives of local

25 governments.  This argument anticipates the safe-harbor argument addressed in the next

26 section of this order, in the sense that the City contends that even if a local government's

27 zoning ordinances could be said to present barriers to wireless communication, they are

28

ORDER - 6

1    not preempted by the Act because creating zoning ordinances is a valid function of local

2    government.

3          The City's argument has been unequivocally rejected in the Ninth Circuit.  In

4    *Sprint*, the court found that the Act preempted a county's wireless telecommunications

5    ordinance ("WTO"):

6          The County's WTO, on its face, supplements the Zoning Ordinance by
           adding submission requirements to an already voluminous list.  Those
7          requirements are in addition to the open-ended discretion and threat of
           criminal penalties contained in the Zoning Ordinance.  The WTO itself
8          explicitly allows the decision maker to determine whether a facility is
           appropriately "camouflaged," "consistent with community character," and
9          designed to have minimum "visual impact."  We find the County's retort –
           that the elements of the WTO challenged by Spring are traditional facets of
10         zoning that are unobjectionable for the simple reason that the WTO is a
           zoning ordinance rather than a franchise or public-right-of-way ordinance –
11         unconvincing. . . .  We conclude that the WTO imposes a permitting
           structure and design requirements that presents barriers to wireless
12         telecommunications within the County, and is therefore preempted by
           Section 253(a).

13
     *Sprint*, 490 F.3d at 716 (citations omitted).  The county ordinance challenged in *Sprint*
14
     contains similar provisions to the AMC provisions challenged in this case.  Both add
15
     voluminous submission requirements to a multi-layer permitting process, both contain
16
     criminal penalties for non-compliance, and both include subjective aesthetic and design
17
     requirements that vest significant discretion in the decision-making body.  Due to the
18
     similarities between the regulations challenged in this case and those challenged in
19
     *Sprint*, the court applies *Sprint*'s reasoning to find that the challenged provisions of the
20
     AMC present barriers to wireless services and are therefore preempted by Section
21
     253(a).[2]
22

23    _____

24          [2]As *Sprint* also notes, the considerations under a Section 253(a) facial challenge and an as-
     applied challenge under Section 332(c)(7) of the Act are substantially similar.  Both sections
25   proscribe regulations that prohibit or have the effect of prohibiting wireless service.  *See Sprint*,
     490 F.3d at 715.  While challenges brought under the two different sections may face different
26   procedural requirements, a court is asked under either section to consider whether a state or local
     government has prohibited or effectively prohibited wireless service.  Thus, for the same reasons
27   articulated in its analysis of T-Mobile's facial challenge to the AMC, the court would find T-
     Mobile's as-applied challenge successful.  The court therefore need not analyze T-Mobile's as-
28

ORDER - 7

**C.      The Section 253(b) safe harbor does not prevent preemption.**

The City argues that even if Section 253(a) preempts the AMC, the Section 253(b) safe harbor applies to prevent preemption.  The Act contains safe harbors exempting certain types of regulations from preemption.  Section 253(b) allows a state to "preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."  Section 253(c) allows states and local government to "manage the public rights-of-way."

T-Mobile contends that the Section 253(b) safe harbor does not protect the AMC because Section 253(b) expressly applies only to states, not local governments.  Few courts have considered this limitation, but those courts have noted that Section 253(b) only applies to local governments if the state has specifically delegated its authority to its local governments.  *Cox*, 204 F.Supp.2d 1260, 1264 (S.D. Cal. 2002); *see also Southwestern Bell Wireless, Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1192 (10th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000).

The City acknowledges that the State has not specifically delegated authority to local governments to regulate telecommunications, but instead relies on the Washington Constitution's general delegation of police powers to local governments.  *See* Wash. Const., art. XI, § 11; *see also Myhre v. City of Spokane*, 70 Wn.2d 207, 210 (1967) ("Zoning is a discretionary exercise of police power by a legislative authority.").  T-Mobile contends that a delegation of police power is too general to be considered a delegation for Section 253(b) purposes.  T-Mobile also argues that even if the delegation was valid, Section 253(b) does not protect the AMC because the challenged sections are unrelated to public safety and welfare.

In *Cox*, a case both parties cite to support their position, the defendant wireless provider conceded that the state had delegated to its subdivisions the authority to

---

applied challenge under Section 332(c)(7), and accordingly DENIES the City's motion to strike (Dkt. # 30) certain evidence related to the Section 332(c)(7) claim.

ORDER - 8

1    regulating the time, place, and manner of installing public utilities.  *Cox*, 204 F. Supp. 2d

2    at 1268.  This authority was limited to what was "necessary to safeguard the public,

3    health, safety and welfare to the extent not prohibited by law." *Id*. at 1269.  Based on

4    this concession, the court found that, for purposes of ruling on the preliminary injunction

5    motion, Section 253(b) probably saved a city regulation directing the permitting authority

6    to consider whether granting a variance would be materially detrimental to the public

7    health, safety, or welfare. *Id*.

8         This case is distinguishable from *Cox* because in this case, the wireless provider

9    contests delegation and the alleged delegation is very broad and general.  And though *Cox*

10   addressed the Section 253(b) and (c) safe harbors in the context of ruling on a motion for

11   preliminary injunction, that court nonetheless unequivocally stated that Section 253(b)

12   does not apply to local governments unless the state delegates the authority to regulate

13   telecommunications services to municipalities.  This conclusion is consistent with a

14   comparison of the language of Section 253(b) (referring to state regulations) and Section

15   253(c) (referring to state and local regulations).  The City has not shown that the State

16   intended to delegate its authority to regulate telecommunications to local governments; in

17   fact, state laws indicate that the State intended to *prevent* such delegation.  RCW

18   35.99.040(2)(c) states that a city's zoning authority over telecommunications providers is

19   limited by Section 253, and RCW 35.99.040(1)(a) and (c) prohibit cities from regulating

20   the services or business operations of telecommunications providers.

21        Even if the State had delegated its authority to the City, the challenged provisions

22   of the AMC would not be saved by Section 253(b) because the City has not shown that

23   they are necessary for the protection of public safety and welfare.  Though the City

24   claims that the challenged provisions protect the public welfare because they are based on

25   traditional zoning concerns, such as aesthetics and property values, this interpretation of

26   the Section 253(b) safe harbor threatens to swallow the preemption rule.  If any zoning

27   ordinance was protected merely by virtue of being a zoning ordinance, there would be no

28   need for Section 253(a).  The Ninth Circuit rejected this type of argument in *Auburn*.

ORDER - 9

1    In *Auburn*, city ordinances contained provisions requiring a telecommunications

2  franchise applicant to describe its technical, financial, and legal ability to provide

3  wireless services; provisions regulating transfer of shares of ownership in the

4  telecommunications companies; provisions requiring the wireless provider to offer certain

5  rates and terms to the communities served by the franchise; and provisions allowing the

6  city council to impose conditions on a franchise as required by the public interest. *See*

7  *Auburn*, 260 F.2d at 1178-79.  Though the defendant cities claimed that the provisions

8  were related to the cities' fitness to provide services, and thus related to the cities'

9  protected interest in managing their rights-of-way under the Section 253(c) safe harbor,

10  the court found that the cities' argument led to absurd results:

11      For example, [the cities] say stock ownership is linked to a company's
financial well-being, which may affect its continued existence, or its ability

12  to pay fees or other necessary costs, which may ultimately affect its use of
the right-of-way. . . .  This is simply too tenuous a connection to the

13  "manage[ment] of rights of way."  Under this semantic two-step, § 253(c)
would have no limiting principle.  The safe harbor provisions would

14  swallow whole the broad congressional preemption.  Municipalities could
regulate nearly any aspect of the telecommunications business.  Indeed,

15  these regulations come perilously close to this *reductio ad absurdum*.

16  *Auburn*, 260 F.3d at 1180.

17    The court shares the same concerns in this case.  The City's argument would

18  justify the use of any regulation that could be tangentially tied to public safety and

19  welfare, and the City essentially defines any zoning-related regulation as related to public

20  safety and welfare.  But this circular logic would lead to the result that no zoning-related

21  regulation could ever be preempted under Section 253(a), and *Sprint* flatly rejects this

22  contention:

23      We find the County's retort – that the elements of the [Wireless
Telecommunications Ordinance] challenged by Sprint are traditional facets

24  of zoning that are unobjectionable for the simple reason that the [ordinance]
is a zoning ordinance rather than a franchise or public right-of-way

25  ordinance – unconvincing.

26  *Sprint*, 490 F.3d at 716.  In other words, just because regulations can be classified as

27  zoning regulations does not mean that they cannot be preempted by Section 253(a).  If the

28

ORDER - 10

1   regulations create a barrier to wireless telecommunications, Section 253(a) preemption

2   applies.

3           *Sprint* does not address the Section 253(b) safe harbor, and the City urges this

4   court not to view *Sprint*'s silence as support for T-Mobile's position that the Section

5   253(b) safe harbor does not protect the challenged portions of the AMC from preemption.

6   The fact that *Sprint* does not address Section 253(b) is not surprising, given that the

7   district court order did not address it either.  *See Sprint Telephony PCS, L.P. v. County of*

8   *San Diego*, 377 F. Supp. 2d 886 (S.D. Cal. 2005).  When *Sprint* and *Auburn* are read

9   together, in light of the purpose of the Act, the court concludes that the Act's safe harbors

10  have a more limited applicability than the City will admit.  The purpose of the Act is to

11  create federal regulation of wireless service, and to preempt state and local regulations

12  that violate those federal regulations.  State and local government regulations that prohibit

13  or present barriers to wireless services are generally preempted, though certain narrow

14  functions of those governments are exempted.  If, as the City contends, zoning ordinances

15  constituting a barrier to wireless service are considered, by definition, to be an exempted

16  function of local government, zoning ordinances would never be preempted.  But *Sprint*

17  rejects this precise argument.  And although the City appears to argue that the court

18  should look to Section 332(c)(7) as a basis for finding that the City's zoning authority is

19  not preempted, Section 332(c)(7) is not a third safe harbor from preemption.  Instead,

20  Section 332(c)(7) places restrictions on the local government's decisions regarding the

21  placement, construction, and modification of personal wireless service facilities.

22  Although it does reveal Congress' recognition that there are legitimate state and local

23  concerns related to wireless communications, Section 332(c)(7) is not a safe harbor

24  protecting all local zoning regulations from preemption.  *See Sprint*, 490 F.3d at 714

25  (concluding that if Congress had been concerned that Section 253(a) would preempt the

26  regulations protected by Section 332(c)(7), it would have created a safe harbor for those

27  regulations).

28

ORDER - 11

Therefore, the court finds that Section 253(b) does not save the challenged portions of the AMC.  Because these portions impose an onerous permitting structure and grant considerable discretion to the permitting authority, the court finds that Chapter 17.63, Chapter 17.64, and Section 17.10.100 of the AMC present barriers to wireless telecommunications in the City and are therefore preempted by Section 253(a).  Though the court has considered the other arguments raised in the parties' briefing, including those related to T-Mobile's Section 332(c)(7) challenge, the court need not address those arguments given the court's resolution of the Section 253(a) preemption issue.

**D.  The challenged portions of the AMC cannot be severed from the valid portions.**

In the City's briefing, it contended that the challenged portions of the AMC could be severed if the court found them to be preempted.  *See* Deft.'s Opp'n at 20-21.  At oral argument, however, the parties agreed that severing the challenged portions of the AMC would eviscerate the permitting scheme, leaving a disjointed and unworkable code.

T-Mobile requests that, rather than remand the permit application for further consideration by the City as the City requests, the court simply order that the City approve the permit application.  The court has considered following an approach taken by *Berkeley*, wherein the City would be given an opportunity to show cause under the AMC's non-exempted portions or other valid regulations why the court should not order that the permit application be granted.  *See Berkeley*, 146 F. Supp. 2d at 1105 (where a city's permitting ordinance was exempted under Section 253(a), but where the wireless provider's application raised concerns regarding excavation and encroachment issues, the court allowed the defendant to show cause why a permit approval should not be ordered).

In *Berkeley*, there were many disputes of material fact related to the environmental impact of the wireless provider's proposed use, such that the court was hesitant to order that the permit be granted without further consideration of the significant potential consequences.  In this case, the administrative record shows that T-Mobile has complied

ORDER - 12

1   with all submission requirements under the AMC, and no issues of material fact are in

2   dispute.  Therefore, the court will provide T-Mobile with its requested relief.

3                                     **IV.  CONCLUSION**

4          For the foregoing reasons, the court GRANTS T-Mobile's motion for summary

5   judgment (Dkt. # 12), DENIES the City's motion for summary judgment (Dkt. # 27), and

6   DENIES the City's motion to strike (Dkt. # 30).

7          IT IS HEREBY ORDERED as follows:

8          (1)    The City is enjoined from enforcing on T-Mobile Chapter 17.63, Chapter

9                 17.64, and Section 17.10.100 of the AMC, as they relate to wireless

10                telecommunications facilities; and

11         (2)    The City must issue a permit allowing T-Mobile to construct the wireless

12                communications facility as proposed in its application.

13

14         Dated this 6th day of May, 2008.

15

16                                            The Honorable Richard A. Jones
                                              United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

ORDER - 13